UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF THE MAINE MARITIME MUSEUM, AS OWNER OF THE SCHOONER MARY E, FOR EXONERATION FROM OR LIMITATION OF LIABILITY | ) ) ) Docket No. 2:21-cv-00238-NT ) ) ) |

**DEFAULT JUDGMENT AND DECREE OF EXONERATION**

Before me are Plaintiff Maine Maritime Museum's Renewed Motion for Entry of Default Judgment and Decree of Exoneration ("**Renewed Motion for Default Judgment**") (ECF No. 44) and the Plaintiff's Motion in Limine as to Evidence of Compromise of Claims (ECF No. 49). For the reasons stated below, both motions are **GRANTED**.

**BACKGROUND**

On August 20, 2021, The Maine Maritime Museum (the "**Plaintiff**" or the "**Museum**"), as owner and operator of the Schooner Mary E, filed a Complaint pursuant to the Limitation of Liability Act (the "**LOL Act**"), 46 U.S.C. §§ 30501–12, and Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("**Supplemental Rule F**") of the Federal Rules of Civil Procedure. Compl. (ECF No. 1). The Complaint sought exoneration and limitation of liability for all losses, damages, or destruction caused by or resulting from the knock-down of the Mary E on July 30, 2021, while the vessel was carrying passengers on a Kennebec River cruise that sailed out of Bath, Maine. *Id.*

On August 26, 2021, the Court entered an order, requiring the Plaintiff to file an *ad interim* stipulation for value in the form of a surety bond in the amount of $150,000.00. Order Regarding Motion for Order Directing Issuance of Notice, Approving Plaintiff's Appraiser's Report, and Restraining Prosecution of Claims (ECF No. 7). As required under Supplemental Rule F, I established a monition period, ending November 15, 2021, and issued a restraining order prohibiting the filing of any claim in any other court or jurisdiction. Order Directing Issuance of Notice and Restraining Prosecution of Claims (ECF No. 10). During this time, the Museum mailed notice to known potential claimants and published notice in the *Portland Press Herald* stating that potential claimants were to file claims within the monition period or face the entry of default and default judgment. Decl. of William H. Welte ¶¶ 9–13 (ECF No. 21); Decl. of William H. Welte Ex. B (ECF No. 21-2).

Three individuals filed claims against the Museum. On October 19, 2021, Karen Baldwin filed a claim. Answer, Claim & Countercl. (ECF No. 13). And on November 12, 2021, Allison Poirier and Thomas Poirier both filed claims. Answer & Claim (ECF No. 15); Answer & Claim (ECF No. 16). All three claimants of record subsequently agreed to dismiss their claims against the Plaintiff with prejudice. *See* Stipulations of Dismissal of Claims (ECF Nos. 36, 38).

On November 16, 2021, after the monition period had ended, the Plaintiff moved for an entry of default against all claimants who had not filed claims by the November 15, 2021 deadline. Mot. for Entry of Default (ECF No. 20). In accordance with Federal Rule of Civil Procedure 55(a) and Supplemental Rule F(5), the Clerk of

2

Court granted the Plaintiff's motion on November 17, 2021. Order (ECF No. 22). No further claims have been filed.

On March 2, 2022, the Plaintiff moved for default judgment and an exoneration decree as to all non-appearing claimants. Mot. for Default J. and Exoneration Decree as to Non-Appearing Claimants (ECF No. 34). After reviewing the Plaintiff's initial motion, I held a telephonic conference (ECF No. 37) with counsel for the Plaintiff on March 7, 2022, during which time I asked for supplemental briefing on two issues: (1) the Plaintiff's entitlement to an exoneration decree absent some factual determination on the question of the Museum's degree of culpability, and (2) the Plaintiff's entitlement to default judgment, particularly as this form of relief is impacted by the special consideration of minors and "incompetent" persons contained in section 30508(d) of the LOL Act and Federal Rule of Civil Procedure 55. Following the conference, the Plaintiff submitted supplemental briefing again asking me to grant its motion for default judgment and an exoneration decree. Me. Mar. Museum's Suppl. Br. in Supp. of its Mot. for Entry of Default J. with Exoneration Decree as to Non-Appearing Claimants (ECF No. 39).

Based on the lack of information before me that would support exoneration or limiting liability, I denied the Museum's motion for default judgment and for an exoneration decree. Order on Mot. for Entry of Default J. with Exoneration Decree as to Non-Appearing Claimants ("**First Order**") (ECF No. 41). Specifically, I held that the record did not permit me to find: (1) that the Plaintiff was entitled to exoneration because there was not enough factual information to support a finding both that the

3

Mary E was seaworthy and that the Museum was not negligent; and (2) that the Plaintiff was not entitled to an order limiting liability because the Complaint failed to provide the facts on which the right to limit liability was asserted. First Order 6–9. I subsequently entered a docket text-only order stating that "the Plaintiff may request an evidentiary hearing on its entitlement to limitation of liability and exoneration." Order (ECF No. 42). On July 11, 2022, the Plaintiff took me up on this offer and filed a request for an evidentiary hearing, or alternatively an opportunity "to renew its motion for default judgment and exoneration decree and file factual witness affidavits and documentation in support thereof." Pl.'s Req. for Evid. Hr'g (ECF No. 43).

With the Court's permission, in August of 2022, the Plaintiff filed its Renewed Motion for Default Judgment and several supporting affidavits and exhibits. Renewed Mot. for Default J.; Decl. of Jason Morin ("**Morin Decl.**") (ECF No. 45); Decl. of Jonathan B. Smith ("**Smith Decl.**") (ECF No. 46); Decl. of Thomas Farrell ("**Farrell Decl.**") (ECF No. 47); Decl. of Christopher Flansburg ("**Flansburg Decl.**") (ECF No. 48).

## DISCUSSION

As I explained in my First Order, the LOL Act limits shipowner liability to "the value of the vessel and pending freight" for claims "arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge

of the owner." 46 U.S.C. § 30505. To initiate the protections of the Act, "[t]he owner of a vessel may bring a civil action in a district court." 46 U.S.C. § 30511(a). A vessel owner's complaint seeking limitation of liability "may demand exoneration from as well as limitation of liability." Fed. R. Civ. P. Suppl. R. F(2). Limitation operates as a "partial exemption [from liability] to the extent of the value of the owner's interest in the vessel and her pending freight," while exoneration is the "complete exoneration from liability." 3 BENEDICT ON ADMIRALTY § 74.

In a limitation proceeding brought under the LOL Act, I engage in a two-step inquiry. First, I must determine whether the shipowner is entitled to exoneration, or, in other words, whether any "acts of negligence or unseaworthiness caused the casualty." *In re Bridge Constr. Servs. of Fla., Inc.*, 39 F. Supp. 3d 373, 382 (S.D.N.Y. 2014). "Exoneration is contingent upon a finding of no contributory fault." *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977). "If no liability is found to exist, the petitioner is entitled to a decree of exoneration, and there is no need to consider the claim to limitation, for if no liability exists there is nothing to limit." *In re Trawler Snoopy, Inc.*, 268 F. Supp. 951, 953 (D. Me. 1967) (quotation marks omitted). If I find that the shipowner is not entitled to exoneration, I then move on to the second step, wherein I must determine whether the shipowner had knowledge or privity of the fault (i.e., the acts of negligence or unseaworthiness) that caused the casualty. *See Bensch v. Est. of Umar*, 2 F.4th 70, 73 (2d Cir. 2021).

Here, I find that the Museum has now met its burden of proof and established that it is entitled to exoneration. I begin by taking the well-pleaded factual allegations

5

in the Complaint as true. *See Munson v. 1979 26 Cal Sailboat*, No. 2:21-cv-0418-KJM-CKD, 2022 WL 215119, at *2 (E.D. Cal. Jan. 25, 2022) ("Once default is entered, well-pleaded factual allegations in the operative complaint are generally taken as true . . . ."). The Complaint alleges that the Museum "used due diligence" to ensure that the Mary E was seaworthy and safe, properly equipped and supplied, and "in all respects seaworthy and fit for the services for which she was engaged." Compl. ¶ 3. I then turn to the additional evidence provided by the Plaintiff to determine whether any acts of negligence or unseaworthiness on the part of the Museum caused the knock-down casualty in question.

The Museum acquired the Mary E in late 2016 and restored the vessel in 2017 and 2018. *See* Morin Decl. ¶¶ 5–9. Before deploying the Mary E as a passenger-carrying vessel, the Museum worked with the United States Coast Guard and qualified shipwrights and naval architects, including Thomas Farrell, to acquire the certification and authority to allow the vessel to carry passengers. Morin Decl. ¶¶ 5–7. In June of 2018, the Coast Guard conducted a stability test and issued a stability letter confirming that the Mary E "ha[d] satisfactory stability for passenger service on partially protected waters" subject to certain operating restrictions, such as a maximum of 33 persons on board. Morin Decl. ¶ 8; Morin Decl. Ex. B (ECF No. 45-2). The stability testing corroborated the review and calculations made by Naval Architect and Marine Engineer Farrell, who concluded that the Mary E met the requirements for vessels of her type and configuration pursuant to 46 C.F.R. § 178.330. Farrell Decl. ¶¶ 3–5. Mr. Farrell opines that if the Mary E was sailing in

6

the same configuration as when tested, without additional ballast or weights and with only mainsail and jib raised and with no more than 18 people on board, then "the vessel was operating well within compliance of the stability letter." Farrell Decl. ¶ 7. The Plaintiff also has submitted the Coast Guard-issued Certificate of Inspection for the Mary E, which had a June 2023 expiration date and permitted the Museum to operate the Mary E carrying passengers on the navigable waters of the Kennebec River. Morin Decl. ¶ 9; Morin Decl. Ex. C (ECF No. 45-3).

In addition, the Museum has provided testimony in the form of a sworn declaration from Captain Jonathan B. Smith, the licensed vessel master of the Mary E on the day of the casualty. *See* Smith Decl. ¶ 5. Captain Smith has held a 1600 Ton Auxiliary Sail Master (Oceans) License from the Coast Guard for about 25 years, has experience on many seagoing vessels, including a number of traditionally rigged sail training schooners, such as the Harvey Gamage, the Westward, and the Roseway, and was awarded a Lifetime Achievement Award by the American Sail Training Association. Smith Decl. ¶¶ 2–4. Captain Smith had also sailed the Mary E previously and is familiar with the vessel's characteristics and behavior. Smith Decl. ¶ 14.

On July 30, 2021, the day of the casualty, Captain Smith had checked the marine forecast for the area, and the weather was partly cloudy with good visibility and a northwesterly wind of just 7–10 knots, gusting to 11–16 knots. Smith Decl. ¶ 5. Captain Smith described what happened just before the knock-down:

> There were 18 souls on board, 15 passengers and 3 crew, none of whom were minors. The vessel proceeded uneventfully down [the Kennebec River] under mainsail and jib only, heading with the wind downriver against the current and the engine secured. Upon reaching at [sic] point

7

> off of Morse Cove, a little after 1700 hours MARY E rounded up to proceed back upriver, short tacking against the wind, with the flooding current, assisted by the engine at low RPM and bound for the nun buoy off Bath Iron Works. The wind in that area and at that time was light, force 2–3. Just SE of Doubling Point Light MARY E was brought through the wind on to a starboard tack to head in the direction of Winnegance Cove, still motor sailing, with the sails sheeted close hauled. A few hundred feet off the Light, MARY E experienced a sudden wind gust of 20kts or less as best I can determine. The vessel leaned to port in the gust, her scuppers went awash, then her rail as well. Reacting as I normally would and as trained to do, I put the helm down trying to round up into the wind, expecting the vessel to return to an even keel as most vessels in my experience, specifically including MARY E, do and have done. At no point did MARY E attempt to right herself or to round up toward the wind; instead, she went over on her beam ends with masts parallel to the water surface. In the manner just described, MARY E sustained a "knock-down" . . . .

Smith Decl. ¶ 6 (footnote omitted). The fact that the Mary E did not right itself was surprising to Captain Smith and was "a highly unusual and completely unexpected occurrence in [his] career and experience." Smith Decl. ¶ 14. Captain Smith states that the entire knock-down happened in what seemed like less than five seconds. Smith Decl. ¶ 7. Afterward, the three crew members passed out life jackets, made mayday and 911 calls, and waited until all fifteen passengers were in rescue boats before they left the Mary E. Smith Decl. ¶¶ 6–7.

Prior to the incident, Captain Smith had examined the stability letter and Certificate of Inspection issued to the Mary E by the Coast Guard, and he was aware of the restrictions imposed in them. Smith Decl. ¶ 9. Captain Smith testified that "those restrictions and parameters were met and complied with" at all times that he operated the vessel, including on the day of the incident. Smith Decl. ¶¶ 9–10. The sail area and number of passengers were well below the restrictions, and the location

of the trip was well within the navigational limits. Smith Decl. ¶ 10. Captain Smith testified that, on the trip in question, the "Mary E was properly manned, equipped, sound, tight, staunch, strong, and in all respects seaworthy to the letter of the law. She was constructed, outfitted, manned, and in all respects fitted, for the voyage undertaken." Smith Decl. ¶¶ 11–12. He also testified that he is unaware of anything that would suggest that the Museum did not act as a reasonably prudent vessel owner and operator of the Mary E at the time. Smith Decl. ¶ 13. Following the casualty, Captain Smith was interviewed several times by representatives of investigating agencies. Smith Decl. ¶ 15. Captain Smith does not believe that the cause of the knock-down was in any way related to "any condition of the vessel, lack of care, or inattention to duty on the part of the [Museum] or the vessel's crew." Smith Decl. ¶ 14.

Christopher Flansburg, another licensed and highly experienced vessel master who personally knows both Captain Smith and the Mary E, confirmed via declaration testimony that Captain Smith "has deep experience at sea and in particular with traditional sail craft and the ability to safely and effectively command, operate, pilot and navigate traditional craft such as the Schooner Mary E under sail." Flansburg Decl. ¶¶ 4–7. Captain Flansburg has sailed with Captain Smith and observed his sailing from other vessels and states that Captain Smith "is a competent mariner who commands traditional sail craft prudently and with due regard to the safety of his passengers." Flansburg Decl. ¶¶ 6–7. In Captain Flansburg's opinion, Captain Smith

"is one of the most experienced Captains licensed to sail and actively sailing traditional sailing vessels in the United States at this time." Flansburg Decl. ¶ 7.

Based upon the foregoing evidence, and in the absence of any contravening evidence, I find that the knock-down sustained by the Mary E was not caused by the vessel's unseaworthiness. The evidence shows that the vessel was seaworthy at the time of the knock-down: the Mary E was issued a stability letter after having passed a Coast Guard stability test; she held a valid Certificate of Inspection; and she was being operated according to all of the limitations imposed by those documents. Likewise, I find that the casualty was not caused by any contributory acts of negligence on the part of the Museum or anyone acting under it, including the captain and crew operating the Mary E at the time of the knock-down. The evidence shows that the master of the vessel, Captain Smith, held a valid license and was very experienced in sailing the Mary E and other schooners like her, and that the cause of the knock-down was not related to any lack of care or negligent act by Captain Smith or his crew members. Because I find no contributory fault, the Museum is entitled to a decree of exoneration.

## CONCLUSION

For the reasons stated above, I **GRANT** the Plaintiff's Renewed Motion for Entry of Default Judgment (ECF No. 44).[1] All claimants of record have now agreed

---

[1] The Plaintiff moved in limine to exclude evidence of compromise under Fed. R. Evid. 408 or the principles animating that rule. Pl.'s Mot. in Lim. as to Evid. of Compromise of Claims (ECF No. 49). I have not considered the fact that the Plaintiff settled claims with three passengers as evidence of liability. Accordingly, the Plaintiff's Motion in Limine is **GRANTED**.

to dismiss their claims against the Plaintiff, with prejudice, and it appears by motion of the attorneys for the Plaintiff that no further claims have been filed and that all claims and answers filed herein against The Maine Maritime Museum have been or will be dismissed, with prejudice. Thus the Plaintiff has no responsibility or liability for the aforesaid matters and is entitled to a decree of exoneration from all claims arising from the July 30, 2021 knock-down of the Schooner Mary E and related matters.

It is therefore **ORDERED, ADJUDGED, AND DECREED** that The Maine Maritime Museum is hereby exonerated for all claims arising from the July 30, 2021 knock-down of the Schooner Mary E; that the default of all persons, firms, and corporations who may have sustained any damages, losses, or destruction caused by or resulting from the knock-down of the Schooner Mary E and her crew who have not filed claims is hereby entered; and that judgment by default of all such persons, firms, and corporations and any state, county, government, government agency, or any political subdivision thereof, or any other person or entity having or claiming to have sustained any losses, damages, or destruction by reason of or in connection with the aforesaid matters is hereby entered; and that the future filing or presentation of any such claims or answers is hereby forever restrained.

It is **FURTHER ORDERED, ADJUDGED, AND DECREED** that the knock-down of the Schooner Mary E on or about July 30, 2021 in the Kennebec River off the Port of Bath, Maine, and any loss, destruction, damage, or injuries resulting therefrom were done, occasioned, and occurred without the privity and knowledge of

the Plaintiff, The Maine Maritime Museum, and without negligence or fault or liability on the part of the Museum and it is hereby forever exonerated and discharged from any and all liability and any and all claims, losses, destruction, damage, or injury arising out of or related to the knock-down of the Schooner Mary E, including but not limited to the aforesaid claimants.

It is **FURTHER ORDERED, ADJUDGED, AND DECREED** that all bonds, stipulations for costs and *ad interim* stipulations for value filed by The Maine Maritime Museum be and are hereby forever cancelled and discharged of record, and that Atlantic Specialty Insurance Company be and is hereby discharged from any past, present, or future liability in connection with the bond posted herein.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 26th day of September, 2022.