# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| In the Matter of the Complaint of THE MAINE MARITIME MUSEUM, as Owner of the Schooner *MARY E*, (O.N. 203729), Her Engines, Machinery, Tackle, Apparel, Appurtenances, etc., for Exoneration From or Limitation of Liability, Civil and Maritime. | Docket No. 2:21-cv-00238-NT |

## ORDER ON DEFENDANT BATH IRON WORKS CORPORATION'S MOTION TO DISMISS THIRD-PARTY CLAIMS OF THE MAINE MARITIME MUSEUM

Before me is Defendant Bath Iron Works Corporation's motion to dismiss six of the seven claims brought by the Maine Maritime Museum in its third-party complaint against Bath Iron Works Corporation (ECF No. 106). For the reasons stated below, the motion to dismiss is **GRANTED IN PART**.

## BACKGROUND

On August 20, 2021, the Maine Maritime Museum ("**MMM**"), as owner and operator of the Schooner *Mary E*, filed a complaint pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501–12, and Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure. Compl. for Exoneration from or Limitation of Liability (ECF No. 1). The complaint sought exoneration and limitation of liability for all losses, damages, or destruction caused by or resulting from the knockdown of the *Mary E* on July 30,

2021, while the vessel was carrying passengers on a Kennebec River cruise that sailed out of Bath, Maine. Compl. for Exoneration from or Limitation of Liability.

James Dotson ("**Dotson**") filed a claim against MMM. Answer, Affirmative Defenses and Claim/Countercl. of James Dotson ("**Dotson Claim**") (ECF No. 64). Dotson alleges that at the time of the knockdown of the *Mary E,* he was employed by Bath Iron Works Corporation ("**BIW**"), and he participated in rescuing *Mary E* passengers who fell into the water as a result of the knockdown. Dotson Claim ¶¶ 14–16. Dotson alleges that as he was lifting passengers from the water and into a BIW vessel, he injured both of his shoulders. Dotson Claim ¶¶ 14–17. Dotson later refiled his claim, adding a two-count crossclaim against BIW, his employer, alleging a claim of gross negligence and negligence under the Jones Act and a claim of unseaworthiness. First Am. Answer, Affirmative Defenses and Claim/Cross-cl. of James Dotson (ECF No. 104).

After Dotson filed his claim, MMM moved for and was granted leave to file a third-party complaint. The Maine Maritime Museum's Mot. for Leave to File Third-Party Compl. (ECF No. 81); Order (ECF No 83). In its thirty-party complaint, MMM brings seven claims against BIW. The Maine Maritime Museum's Third-Party Compl. Against Bath Iron Works Corporation ("**Third-Party Compl.**") (ECF No. 88). MMM alleges that BIW holds itself out as a full-service shipyard that specializes in the design, construction, and support of complex surface ships, and employs shipfitters, welders, electricians, fabricators, pipefitters, program managers, designers, naval architects, engineers, business professionals, and ship operators. Third-Party Compl.

2

¶ 5. BIW owns and operates one or more Sea Ark water patrol vessels to enforce security in the naval-restricted area of the Kennebec River adjacent to BIW's shoreside facilities. Third-Party Compl. ¶ 7. On July 30, 2021, Dotson was employed by BIW and was aboard one of these water patrol vessels, the *Sea Ark I*, under the direct supervision of a fellow BIW security officer and employee. Third-Party Compl. ¶ 8. MMM believes that Dotson was a master or individual in charge of *Sea Ark I* and that his supervisor was a master or individual in charge of another of BIW's water patrol vessels, *Sea Ark II*. Third-Party Compl. ¶ 8. According to MMM, BIW hired Dotson without requiring him to have watercraft operations certification but undertook to train him to operate watercraft after hiring him. Third-Party Compl. ¶ 6.

MMM asserts that, at the time Dotson was allegedly injured rescuing *Mary E* passengers, the *Sea Ark I* was not equipped with an appropriate boarding ladder or other means of safely bringing aboard individuals from the water. Third-Party Compl. ¶¶ 10, 12. Further, MMM alleges that the freeboard[1] on the *Sea Ark I* was high and wide with a hull and rails configuration that prevented operators from safely accomplishing boarding from the water, and that it was, according to Dotson, relatively ill-suited for the activity he sought to engage in that day. Third-Party Compl. ¶ 12. Based on those alleged facts, MMM's third-party complaint contains seven counts against BIW: Count One – maritime negligence; Count Two – breach of

---

[1] The "freeboard" is the distance from the waterline to the deck. *Cape Fear, Inc. v. Martin*, 312 F.3d 496, 501 (1st Cir. 2002).

3

statutory duty; Count Three – breach of duty as a Jones Act employer; Count Four – breach of duty as a Longshore & Harbor Workers' Compensation Act employer; Count Five – implied contractual indemnification; Count Six – common law indemnification; and Count Seven – contribution. Third-Party Compl. ¶¶ 14–44.

BIW moved to dismiss most of MMM's third-party claims against it for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Def. Bath Iron Works Corporation's Mot. to Dismiss Third Party Claims of Pet'r Maine Maritime Museum ("**Mot. to Dismiss**") (ECF No. 106).

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), I must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party. *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 61 (1st Cir. 2020). "To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), 'a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief,' with 'enough factual detail to make the asserted claim plausible on its face.' " *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33 (1st Cir. 2022) (quoting *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015)). This evaluation requires me to "perform a two-step analysis." *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016) (quoting *Cardigan Mountain Sch.*, 787 F.3d at 84). I must "first, 'isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements,' then 'take the complaint's well-pled (i.e., non-conclusory, non-

4

speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.'" *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (quoting *Zenon v. Guzman*, 924 F.3d 611, 615–16 (1st Cir. 2019)).

## DISCUSSION

BIW seeks dismissal of six of MMM's seven third-party claims against it. Specifically, BIW moves to dismiss Counts One through Four because they are tort claims that fail due to a lack of any duty owing to MMM, MMM did not actually suffer any direct damages, and because they are "simply claims for indemnity or contribution towards any liability MMM might have to Dotson." Mot. to Dismiss 1. BIW also moves to dismiss Counts Five and Six because they are claims for indemnity that fail as a matter of law. Mot. to Dismiss 1. BIW takes no issue with MMM pursuing its Count Seven claim for contribution. Mot. to Dismiss 1. MMM opposes BIW's motion to dismiss. The Maine Maritime Museum's Opp'n to Bath Iron Works Mot. to Dismiss Counts I–VI of the Third-Party Compl. ("**Opp'n**") (ECF No. 110).

### I. Count One – Maritime Negligence

Count One of MMM's third-party complaint alleges that BIW owed MMM a duty to act in the manner of a reasonably prudent vessel owner and operator in assisting the *Mary E* passengers in the water, that BIW breached its duty by failing to properly train and supervise Dotson and by failing to provide a properly equipped vessel, that BIW's breach of this duty was the proximate cause of Dotson's damages, and that MMM has suffered damages as a result of BIW's breach of duty. Third-Party Compl. ¶¶ 14–18.

5

BIW argues that MMM fails to allege circumstances that could give rise to BIW owing a duty to MMM and that one vessel owner has no general duty to make sure its vessel and crew are ready to respond to the maritime emergency of another vessel. Mot. to Dismiss 5–6. Further, BIW points out that, as a rescuer, its duty was limited to not worsening the situation or causing other potential rescuers to refrain from attempting a rescue. Mot. to Dismiss 6. MMM counters that vessel owners have a duty to avoid or minimize the risk of harm to others. Opp'n 4–5 (citing *Naglieri v. Bay*, 93 F. Supp. 2d 170, 175 (D. Conn. 1999)).[2]

BIW has the better argument. Although the tort of negligence "cuts a wide swathe" throughout general maritime law, *Evans v. Nantucket Cmty. Sailing, Inc.*, 582 F. Supp. 2d 121, 137 (D. Mass. 2008), *amended,* No. CV 05-10088-MBB, 2009 WL 10728978 (D. Mass. Feb. 5, 2009) (quoting 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5–2 (2004)), there is a special standard traditionally applied to rescue situations. *Berg v. Chevron U.S.A., Inc.*, 759 F.2d 1425, 1429 (9th Cir. 1985). As a rescuer, BIW stands in the position of a Good Samaritan. Under the Good Samaritan rule,[3] BIW is only subject to liability to MMM "for physical harm resulting from

---

[2] *Naglieri v. Bay* involved a crew member who went overboard and died, after which his widow sued the owner and skipper of the boat on which the decedent crewed. 93 F. Supp. 2d 170, 170–171 (D. Conn. 1999). The *Naglieri* case therefore falls within the "well established principle of admiralty law that a vessel skipper or captain is ultimately responsible for the safety and welfare of his crew." *Id.* at 175 (internal citation and quotations omitted). Here, MMM seeks to extend the duty of care far beyond that well-established principle.

[3] The First Circuit explained the Good Samaritan rule in the maritime context in *Thames Shipyard and Repair Co. v. United States*, 350 F.3d 247, 261 (1st Cir. 2003). The doctrine is also articulated in several sections of the Second Restatement of Torts. Restatement (Second) of Torts §§ 323, 324A, & 327. *See also* Restatement (Third) of Torts: Liability for Physical & Emotional Harm §§ 42–44.

6

[BIW's] failure to exercise reasonable care to perform [its] undertaking, if (a) [BIW's] failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of [MMM's] reliance upon the undertaking." *Thames Shipyard and Repair Co. v. United States*, 350 F.3d 247, 261 (1st Cir. 2003) (quoting Restatement (Second) of Torts § 323). "The test is not whether the risk was increased over what it would have been if [BIW] had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had [BIW] not engaged in the undertaking at all." *Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994). In other words, a Good Samaritan has a duty of care to the party rescued only if it somehow put that party in a worse position or if the rescued party, by relying on the efforts of the Good Samaritan, lost the chance to have someone else conduct the rescue. *Daley v. United States,* 499 F. Supp. 1005, 1010 (D. Mass. 1980) (explaining that no duty of care is imposed on the Coast Guard unless it "worsens the subject's position, as by causing affirmative injury" or "caus[es] other searchers, or possible searchers, to 'rest on their oars' in reliance on the Coast Guard's undertaking and its presumed . . . competency") (internal citations omitted). *See also Furka v. Great Lakes Dredge & Dock Co.,* 755 F.2d 1085, 1088 (4th Cir. 1985) (holding that "[t]he submission to the jury of the question of [rescuer's] contributory negligence without reference to the special context of rescue" was error); *Grigsby v. Coastal Marine Serv. of Tex., Inc.,* 412 F.2d 1011, 1021 (5th Cir. 1969) ("[O]f all branches of jurisprudence, the admiralty must be the one most hospitable to the impulses of man and law to save life and limb and property."), *cert. dismissed,* 396 U.S. 1033 (1970). MMM has not alleged that

7

BIW's rescue effort increased the risk of harm to MMM or its passengers nor has it alleged that it detrimentally relied on BIWs rescue efforts.

Even were I to find that BIW owed MMM a duty under the traditional negligence standard, MMM fails to plausibly allege another required element of a maritime negligence claim—injury sustained by MMM.[4] The only injuries MMM alleges are "the damages claimed by Dotson in his counterclaim" and the damages that "MMM has suffered and will continue to suffer . . . including attorney's fees and the costs of defending the primary counterclaim." Third-Party Compl. ¶¶ 17–18. To the extent MMM is basing its maritime negligence claim on Dotson's injuries, MMM lacks standing and fails to state an element of the negligence claim because Dotson's injuries are not injuries sustained by MMM. *See Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 203 (D. Me. 2012) ("Establishing negligence under general maritime law requires the plaintiff to demonstrate . . . injury sustained by the plaintiff.").

As for the damages MMM asserts relating to the attorneys' fees and other costs it is incurring in its defense against Dotson's claim against MMM, "[a]dmiralty follows the American rule that absent a statutory provision or a contractual right, there is no legal right to attorneys' fees, and both parties must bear their own costs." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5:8 (6th ed.). So the

---

[4] "[T]he familiar elements of negligence—duty, breach, causation, and damages—apply in maritime cases" and " 'principles of maritime negligence' " supply "substance to each element." *Sawyer Brothers, Inc. v. Island Transporter, LLC*, 887 F.3d 23, 29 (1st Cir. 2018). Therefore, "[e]stablishing negligence under general maritime law requires the plaintiff to demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by the plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 203 (D. Me. 2012) (quoting *Evans v. Nantucket Cmty. Sailing, Inc.*, 582 F. Supp. 2d 121, 137 & n.35 (D. Mass. 2008)).

8

litigation-related expenses alleged by MMM do not constitute a cognizable injury under general maritime negligence law. MMM does not address BIW's claim that the American rule applies and provides no authority to the contrary.  Accordingly, I find that MMM fails to state a claim for maritime negligence.

## II.     Count II – Breach of Statutory Duty

Count Two of MMM's third-party complaint alleges that the master or individual in charge of *Sea Ark I* owed a statutory duty under 46 U.S.C. § 2304(a) to render assistance to the *Mary E* passengers so far as he could do so without serious danger to Dotson, and that the *Sea Ark I* master or individual in charge rendered assistance in a way that was not prudent or seamanlike and that exposed Dotson to danger. Third-Party Compl. ¶¶ 20–21. MMM alleges that, upon information and belief, Dotson himself was the master or individual in charge of the *Sea Ark I*. Third-Party Compl. ¶ 8.

Section 2304(a) provides that "[a] master or individual in charge of a vessel shall render assistance to any individual found at sea in danger of being lost, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or individuals on board." 46 U.S.C. § 2304(a)(1). A person who violates this provision will be fined or imprisoned for up to two years or both. 46 U.S.C. § 2304(b).

MMM alleges that Dotson and BIW breached their statutory duty under 46 U.S.C. § 2304(a). Third-Party Compl. ¶ 22. BIW argues that this statutory count fails because, at most, Section 2304 extends a duty to an "individual found at sea in danger of being lost," not to a vessel owner like MMM whose passengers are at risk. Mot. to

Dismiss 10. Further, MMM and BIW agree that BIW, through Dotson, rendered assistance to those *Mary E* passengers. Mot. to Dismiss 10; Opp'n 6–7. But MMM contends that BIW still breached its duty under Section 2304 because Dotson's rescue attempts "led to his own injury that worsened the position of himself and others." Opp'n 7. In support of this argument, MMM cites *Martinez v. Puerto Rico Marine Management, Inc.*, 755 F. Supp. 1001 (S.D. Ala. 1990).

      Neither party addresses the most glaring problem with Count II of MMM's counterclaim against BIW. As a federal criminal statute, 46 U.S.C. § 2304(a) does not provide for a private right of action in a civil case. *Est. of Pankey v. Carnival Corp.*, No. 22-cv-24004-BLOOM, 2023 WL 5206032 (S.D. Fl. Aug. 14, 2023) (dismissing civil claim brought under 46 U.S.C. 2304(a)(1)). *See generally Klinakis v. Altus Jobs, LLC*, No. 6:22-cv-1756-RBD-RMN, 2023 WL 3563599, at *2 (M.D. Fla. Mar. 21, 2023) (because "language such as imprisonment, fine, and punished" are terms used in criminal statutes, the plain language of statutes using those terms "suggests that they do not create a private right of action"); *Prince v. Dicker*, 29 F. App'x 52, 54 (2d Cir. 2002) (explaining that the plaintiff "cannot invoke the Medicare/Medicaid anti-fraud provisions in a civil complaint because these are criminal provisions"); *Chabrowski, on behalf of ARTBE Enters., LLC v. Litwin*, No. CV-16-03766-PHX-DLR, 2017 WL 2841212, at *2 (D. Ariz. Jan. 19, 2017) ("Federal criminal claims 'must be brought by the Attorney General, not by private citizens, so the Court cannot consider [plaintiff's] claims for violations of criminal statutes.'") (*quoting Cole v. Cole*, No. 3-12-0153, 2012 WL 1825700, at *1 n.1 (M.D. Tenn. May 18, 2012)).

But even if I consider Count II as a cause of action sounding in tort and utilizing 46 U.S.C. § 2304(a)(1) to establish a duty to render assistance, the contours of that duty would be established by the Good Samaritan doctrine as discussed above. *See Martinez v. P.R. Marine Mgmt., Inc.* 755 F. Supp. 1001 (S.D. Ala. 1990) (in a case brought under the Death on the High Seas Act, 46 U.S.C. §§ 761–68, court found that 46 U.S.C. § 2304 imposed a duty to render assistance and applied the Good Samaritan doctrine (Restatement (Second) of Torts § 323) to establish the contours of the duty). Because, as discussed above, MMM fails to allege a violation by BIW of the Good Samaritan rule, Count II also fails to state a claim upon which relief could be granted.

### III.  Counts III and IV – Breach of Duty as a Jones Act Employer and a Longshore and Harbor Workers Compensation Act Employer

Count Three of MMM's third-party complaint alleges that Dotson and BIW are covered by the Jones Act, 46 U.S.C. § 30104, and that BIW breached its duty under the Jones Act to provide Dotson with a reasonably safe place to work, to use proper care to train and supervise him, and to maintain and properly equip and keep in a reasonably safe condition the vessel on which he worked. Third-Party Compl. ¶¶ 24–29.

"The Jones Act provides seamen with a cause of action against employers when 'an employer's failure to exercise reasonable care causes a subsequent injury even where the employer's negligence did not render the ship unseaworthy.'" *Napier v. F/V DEESIE, Inc.*, 454 F.3d 61, 67 (1st Cir. 2006) (quoting *Ferrara v. A. & V. Fishing, Inc.,* 99 F.3d 449, 453 (1st Cir. 1996)). The key part of that sentence for this case is that it is the *seaman* who has the cause of action against his employer. So Dotson

11

may bring a claim against BIW under the Jones Act—indeed, he has—but MMM cannot. MMM recognizes as much by clarifying that it "is not pursuing a Jones Act claim against BIW" but rather BIW's alleged breach of its duties as a Jones Act employer "are indicative of BIW's negligence." Opp'n 8. "By the express terms of the Jones Act an employer-employee relationship is essential to recovery." *Kwak Hyung Rok v. Cont'l Seafoods, Inc.*, 462 F. Supp. 894, 897 (S.D. Ala. 1978), *aff'd sub nom. Quality Marine, Inc. v. Emps. Cas. Co.* and *Rok v. Cont'l Seafoods, Inc.*, 614 F.2d 292 (5th Cir. 1980) (citing *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783 (1949)). Because MMM is outside that employer-employee relationship, it cannot recover on Count Three.[5]

Similarly, Count Four of MMM's third-party complaint alleges that the Longshore and Harbor Workers' Compensation Act ("**LHWCA**"), 33 U.S.C. § 901 et seq., covers Dotson's and BIW's employment relationship. The LHWCA "establishes workers' compensation benefits for longshoremen injured in work-related accidents." *England v. Reinauer Transp. Cos., L.P.*, 194 F.3d 265, 270 (1st Cir. 1999). Under the LHWCA, if a covered employee becomes disabled from an injury occurring on the navigable waters of the United States, the vessel-owning employer must pay compensation to the injured worker regardless of fault. The owner owes its longshore employees "the duty of exercising due care under the circumstances." *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 166 (1981). The duty includes having "the

---

[5] To the extent MMM seeks indemnity from BIW in this claim, *see* Third-Party Compl. ¶ 29, I address that argument below.

ship and its equipment in such condition" that an experienced worker "will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Id.* at 167. Here again, the duty is between BIW and Dotson, and again MMM concedes as much and argues only that "BIW's breach of its duties under the LHWCA are indicative of BIW's negligence." Opp'n 9. Because MMM cannot bring a claim under the LHWCA, Count Four fails to state claim.

### IV.    Counts V and VI – MMM's Claims for Indemnity

In Count Five, MMM alleges that, under a theory of implied contractual indemnity, it is entitled to indemnification by BIW as to any claims found against MMM in this action. Third-Party Compl. ¶¶ 35–40. MMM asserts in Count Six that it is entitled to indemnification under the common law. Third-Party Compl. ¶¶ 41–42.

Maritime law recognizes a party's right to indemnification in three different scenarios:

> First, an express agreement may create a right to indemnification. Second, a contractual right to indemnification may be implied from the nature of the relationship between the parties. Third, a tort-based right to indemnification may be found where there is a great disparity in the fault of the parties.

*Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth.*, 693 F.2d 1, 2 (1st Cir. 1982) (internal citations omitted). MMM first claims that the second circumstance, the implied contract theory, applies here.

Specifically, MMM asserts that BIW's role in assisting MMM by providing marine rescue services "amounts to a generally recognized special relationship" between MMM and BIW, and that BIW's attempt to comply with maritime statutes

13

and its agreement to provide assistance to MMM to comply with those statutes constitute "unique special factors demonstrating that the parties intended that BIW bear the ultimate responsibility for MMM's risk exposure." Third-Party Compl. ¶¶ 36–38. MMM maintains that therefore "BIW impliedly agreed to indemnify MMM for any and all claims and related legal costs arising from any claim for injuries or damages brought by its employee Dotson against MMM and to hold MMM harmless for or on account of any kind of damages arising out of such claims." Third-Party Compl. ¶ 39.

"[A] contractual right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety or when there is a generally recognized special relationship between the parties." *Araujo*, 693 F.2d at 2–3 (internal citations and quotations omitted). The right "may not be implied merely from the fact that" a party was subjected to liability for an injury that it believes the would-be indemnitor played a role in causing because "[s]uch a theory 'turns indemnity on its head.'" *Id.* at 2 (quoting *Santisteven v. Dow Chem. Co.,* 506 F.2d 1216, 1219 (9th Cir. 1974)). Thus, courts have recognized an implied obligation to indemnify in limited circumstances. For example, the special relationship between a stevedoring employer and a shipowner "has been held to imply that the stevedoring company warrants performance of its services"—stowing cargo reasonably safely—"in a workmanlike manner and will indemnify the shipowner for any liability resulting from a breach of that warranty of workmanlike service." *Mar. Overseas*

14

*Corp. v. Ne. Petroleum Indus., Inc.*, 706 F.2d 349, 353 (1st Cir. 1983) (citing *Ryan Stevedoring Co. v. Pan-Atl. S.S. Corp.*, 350 U.S. 124 (1955)). Other relationships that have been recognized to give rise to an implied duty to indemnify "include principal-agent, bailor-bailee, lessor-lessee, union-union member, employer-employee, vessel owner-medical provider, . . . and independent contractors." *In re Air Crash Near Peggy's Cove, Nova Scotia on Sept. 2, 1998*, No. 99-5998, 2004 WL 2486263, at *9 (E.D. Pa. Nov. 2, 2004). Whether implied contractual indemnity applies depends "on elements of expertise, control, supervision and ability to prevent accidents." *Mar. Overseas Corp.*, 706 F.2d at 353–54 (internal quotation and citation omitted).

BIW argues that MMM's claim for implied contractual indemnity fails because there is no allegation that BIW and MMM were in a contractual relationship. Mot. to Dismiss 13. BIW is correct that MMM does not allege any contractual relationship between BIW and MMM. Instead, MMM alleges that "[a]s a result of providing marine rescue services to MMM, BIW impliedly agreed to indemnify MMM." Third-Party Compl. ¶ 39. This, MMM argues, amounts to the special relationship. But MMM points to no case that has held that a rescuer fulfilling its statutory duty under 46 U.S.C. § 2304(a) to assist an individual in danger of being lost at sea has entered into an implied agreement with the shipowner whose vessel put the individual in the water. Nor could I find any case that found an implied contractual indemnity in any factual scenario even remotely analogous to this one.[6] This absence of authority

---

[6] Perhaps this is because indemnity is considered "an all-or-nothing approach that should be applied sparingly and purposefully by the law." Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* § 5:16 (6th ed.). "[I]n most instances, the indemnity issue arises between joint tortfeasors who

15

comes as no surprise given that maritime law embraces policies that promote rescue. As other courts have pointed out, it would be inconsistent with these policies to disincentivize fellow mariners to come to the aid of a seafarer in distress. *Grigsby,* 412 F.2d at 1021 ("Maritime law in every way and in every context encourages the salvor to salve—to save."); *Jolly v. Hoegh Autoliners Shipping AS,* 546 F. Supp. 3d 1105, 1117 (M.D. Fl. 2021) ("[I]f there ever was a body of law that embraced policies that promote rescue and salvage, it is general maritime law.") Accordingly, I find no implied contract of indemnity between MMM and BIW.

Turning to Count Six, I take MMM's common law indemnity claim to be based on the recognized tort-based right to indemnification that may arise where there is a great disparity in the fault of the parties, the third circumstance outlined in *Araujo*. 693 F.2d at 2. MMM alleges that if Dotson recovers damages from MMM, MMM's liability "will have been brought about or caused solely by BIW's carelessness, negligence and failure to act as a competent and prudent crewed vessel owner and operator." Third-Party Compl. ¶ 42. MMM contends that therefore it is entitled to indemnity from BIW for any recovery by Dotson plus interest, attorneys' fees, and costs and expenses incurred defending the action. Third-Party Compl. ¶ 42.

"The availability of common law indemnity under general maritime law is limited." *LCI Shipholdings, Inc. v. Muller Weingarten AG*, 153 F. App'x 929, 931 (5th Cir. 2005). "The doctrine of indemnity . . . shifts the entire amount of the loss

---

have a preexisting contractual relationship," so the question of indemnity is best "left for the parties to negotiate as part of their overall business relationship." *Id.*

(including attorneys' fees) from one party to another." Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* § 5:16 (6th ed.). Common law indemnity "was developed by the courts to allow the total loss to be allocated to one tortfeasor in a joint liability situation where the negligence or fault of one tortfeasor was much greater compared to the fault of the other." *Id.* "Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate." *Araujo*, 693 F.2d at 3.

BIW contends that Count Six fails as a matter of law because for indemnity to attach, MMM and BIW would both need to be found liable, and, if MMM were liable, its liability would be based on its own acts and omissions. Mot. to Dismiss 15. MMM counters that, even if MMM were found negligent as to the knockdown, Dotson's injuries are the result of the superseding cause of BIW's negligence in training Dotson and the unseaworthiness of the *Sea Ark I*. Opp'n 12–13. In reply, BIW argues that MMM cannot use the superseding cause theory for its indemnity claim because BIW's alleged negligence would have occurred prior to MMM's negligence and it would have been foreseeable that untrained mariners in ill-equipped vessels would come to the aid of the *Mary E* passengers. Reply in Supp. of Def. Bath Iron Works Corp.'s Mot. to Dismiss Third Party Claims of Pet'r Maine Maritime Museum 8–9 (ECF No. 113).

At this stage, these underlying questions of negligence and comparative fault among the parties are unresolved, and the parties have not briefed the issue of how principles of comparative fault apply in the rescue context. *See Furka*, 755 F.2d at 1088. Under Federal Rule of Civil Procedure 12(b)(6), I must accept the allegations

17

in MMM's third-party complaint, thin though they are, as true and I must draw all reasonable inferences in MMM's favor. Assuming MMM's allegations are true—that if Dotson recovers against MMM, that liability was "caused solely by BIW's carelessness, negligence and failure to act as a competent and prudent crewed vessel owner and operator," *see* Third-Party Compl. ¶ 42—MMM's claim for common law indemnity may state a claim for relief. Because the same discovery will be needed for both the common law indemnity claim and MMM's claim for contribution, it makes most sense to allow further factual and legal development on this claim and resolve these questions at a later stage of the litigation. Accordingly, BIW's motion to dismiss Count Six is denied.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** Bath Iron Works Corporation's motion to dismiss the third-party claims of Maine Maritime Museum (ECF No. 106). The Court **GRANTS** BIW's motion to dismiss Counts One through Five and **DENIES** BIW's motion to dismiss Count Six (common law indemnification).

SO ORDERED.

/s/ Nancy Torresen  
United States District Judge

Dated this 30th day of September, 2024.